UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| QUINTIN HUCKABY,  §<br>    Plaintiff,  §<br>  §<br>VS.  §<br>  §<br>BRIGGS-FREEMAN REAL ESTATE §<br>BROKERAGE, INC. d/b/a BRIGGS- §<br>FREEMAN INTERNATIONAL §<br>REALTY d/b/a BRIGGS-FREEMAN §<br>SOTHEBY'S INTERNATIONAL §<br>REALTY, and BRIGGS/FREEMAN §<br>REAL ESTATE BROKERAGE, LLC, §<br>d/b/a BRIGGS-FREEMAN §<br>INTERNATIONAL REALTY d/b/a §<br>BRIGGS-FREEMAN SOTHEBY'S §<br>INTERNATIONAL §<br>REALTY,  §<br>    Defendants.  § | A CIVIL ACTION _____<br><br><br><br><br><br>A JURY IS DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**QUINTIN HUCKABY**, Plaintiff, files this Original Complaint against Defendants ("Briggs Freeman" or "Defendants"), and in support would show the Court as follows:

### I.     NATURE OF THE CASE

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and 42 U.S.C. 1981, as well as a pendent state law claim arising under Chapter 21 of the Texas Labor Code, for unlawful and discriminatory employment practices based on race, national origin and color, and retaliation against Plaintiff for having reported and opposed them.

2. Plaintiff **QUINTIN HUCKABY** ("Plaintiff" or "Huckaby") alleges that Defendants subjected him to discrimination in the form of hostile work environment, denial of an interoffice

transfer, and termination because of his race, national origin and color, and retaliation in the form of denial of an interoffice transfer and termination for reporting and opposing discrimination because of race, national origin and color.

## II.  JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action is based on Title VII, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 – both of which are federal statutes, because this action is based on federal statutes regulating commerce. 28 U.S.C. §1337.

4. Venue is proper in the United States District Court for the Eastern District of Texas pursuant to 42 U.S.C. §2000e-5(f), which expressly provides that a Title VII action may be brought "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." Had Plaintiff's transfer from Defendants' Southlake office to its Plano office been granted instead of being unlawfully denied because of race or retaliation, Plaintiff would have worked in Defendants' Plano office. Further, upon information and belief, Defendant has more than one office in the Eastern District.

## III.  PARTIES

5. Plaintiff **QUINTIN HUCKABY** is a resident of Tarrant County, Texas.

6. Defendant **BRIGGS-FREEMAN REAL ESTATE BROKERAGE, INC., d/b/a BRIGGS-FREEMAN INTERNATIONAL REALTY d/b/a BRIGGS-FREEMAN SOTHEBY INTERNATIONAL REALTY,** is a Texas for-profit corporation, which may be served with process by serving its registered agent, Mr. Robert Briggs, 5600 W. Lovers Lane, Ste. 224, Dallas, Texas 75209, or wherever he may be found. After this claim accrued, this Defendant converted itself into Briggs/Freeman Real Estate Brokerage, LLC, d/b/a Briggs-Freeman International Realty (see next paragraph), a Delaware limited liability company.

7.     Defendant **BRIGGS/FREEMAN REAL ESTATE BROKERAGE, LLC, d/b/a BRIGGS-FREEMAN INTERNATIONAL REALTY d/b/a BRIGGS-FREEMAN SOTHEBY INTERNATIONAL REALTY,** is a foreign for-profit limited liability company domiciled in Delaware and doing business in the State of Texas, which may be served with process by serving its registered agent, Mr. Brian M. Lidji, 500 N. Akard Street, Ste. 3500, Dallas, Texas 75201, or wherever he may be found.

## IV.     FACTS

8.     Huckaby began working for Briggs-Freeman on or about April 18, 2019, as a licensed realtor selling high-end real estate.

9.     Huckaby worked in Briggs-Freeman's Southlake office, and he was initially the only black or African American realtor until an African American woman joined that office as a realtor a few months later.

10.     Huckaby got along well with his first immediate supervisor at Briggs-Freeman – Ms. Tonja Schult – who managed the Southlake office.  Huckaby liked Briggs-Freeman's Southlake work environment under Schult's leadership.

11.     On or about November 1, 2019, Ms. Schult invited Huckaby to attend a breakfast with seven (7) of his white co-agents at 8:30 a.m. at a Fort Worth networking event. Huckaby was the only black/African American at this breakfast.

12.     While Huckaby was sitting at the table, one of the company's owners – Mr. Robbie Briggs (hereafter "Briggs") – who is white, stated, "Hi Quintin, I have a son who wants to be black."

13.     Huckaby had no idea how to respond to this, so he remained quiet but horrified.

14.     Briggs then proceeded to tell Huckaby – in front of the entire group – that Briggs' son "sags his pants and listens to rap music."

15. Huckaby continued to sit in stunned silence while watching his co-workers' facial expressions turn toward Mr. Briggs in disgust.

16. Huckaby himself made a facial expression as well, hoping to communicate to Mr. Briggs this type of conversation was not appropriate.

17. Despite the reactions of the table and Huckaby, Briggs continued in front of everyone present: "My son tells me, one day my son says, 'Dad, I should have been born black.'"

18. Huckaby began to try and make conversation with other people, rather than continue to be engaged by Briggs in this manner.

19. Although Briggs later apologized via text and offered to meet in person "if I need to," Briggs never followed up with Huckaby to meet in person, or to address Briggs' racially offensive conduct.

20. Ms. Schult – Huckaby's immediate supervisor and the manager of the Southlake office – informed Huckaby that Briggs had previously made other racially charged comments to a different African American/black realtor in the Fort Worth office.

21. This information, along with the bad taste Briggs' November breakfast remarks had given Huckaby, created a cloud over Huckaby's Briggs-Freeman environment that never really changed.

22. Within a couple of months, Ms. Schult, the Southlake manager and Huckaby's immediate supervisor, left Briggs Freeman and was replaced by another white manager – a woman named Marilyn Newton.

23. When Newton became his supervisor, Huckaby noticed an immediate change in the way he was treated in Briggs-Freeman's Southlake office.

24. For example, a photo shoot for a company advertisement in a local upscale magazine was arranged for the Southlake office. All of the white realtors were notified in advance, and they all dressed for the occasion.

25. Huckaby and the other black/African American agent – the woman who'd joined the office after Huckaby – were not informed about the photo shoot and were excluded from it.

26. Both Huckaby and the other black/African American agent were also excluded from a marketing meeting on or about February 20, 2020.

27. Moreover, Huckaby had previously brought contracts into Briggs-Freeman from his previous position (contracts his previous supervisor – Schult – had approved).

28. Soon after Newton became Huckaby's supervisor, she began criticizing these contracts and became significantly more critical regarding Huckaby's performance and office hours than she was of the white agents, or than Schult had ever been of Huckaby.

29. On or about February 22, 2020, Huckaby had a very awkward exchange with Newton – the Southlake manager – about an open house Huckaby and the Southlake's office's other black/African American had staffed for one of the office's white listing agents.

30. Huckaby knew he was running late, so he had his team member – the other black realtor – help open the door to start the open house.

31. The white listing agent called Huckaby and alleged the other black/African American realtor was "not competent to be inside the home," or words to that effect.

32. Huckaby replied that the other black/African American agent was quite capable of holding the home open, but the white listing agent reiterated that the other black/African American listing agent was not qualified to hold open "a home that big" because "she isn't that smart."

33. When Huckaby arrived at the open house, he was uncomfortable with the way the white agent had insulted his co-worker – the other black/African American agent – so he suggested they close down the open house.

34. After the two black/African American realtors and co-workers had turned off the lights, closed the front door and were just about to leave, an African American gentleman came to the door. After Huckaby informed the gentlemen the open house was closing down early, the gentleman tried to force his way into the home, and later apparently called the white listing agent and complained he had not been allowed to view the home.

35. At the open house, Huckaby never heard the African American gentleman claim he was being turned away because of race by two black/African American agents.

36. Oddly, however – at least according to the white listing agent via Newton – the gentleman allegedly complained to the white listing agent that Briggs-Freeman was discriminating against him because of race by not letting him into the home.

37. The white listing agent apparently then called Newton, who called Huckaby.  Through this exchange, it became obvious Newton knew the gentleman Huckaby had turned away was black/African American. Upon information and belief, no one at Briggs-Freeman had any further information about the man.

38. Huckaby explained to Newton what had happened at the open house – including the white listing agent's having denigrated the female black/African American agent's intelligence, its effect on their comfort level at continue to do the white listing agent a favor by covering the open house on her listing. Newton replied she would investigate and call Huckaby back.

39. When she did, Newton asserted that the African American gentleman "could not afford the home anyway." Huckaby was never told how (other than the fact that the gentlemen was African American) Newton concluded he "could not afford the home."

40. After the Southlake office's regular office meeting on February 25, 2020, Huckaby and the other black/African American agent planned to confront the white listing agent about all of the negative things she had claimed about the female black/African American agent.

41. Before they could speak with the white listing agent, however, they were intercepted by Newton and told to come speak with Newton in the back office.

42. Huckaby explained to Newton how several of the agents were not being team-like minded when it came to the other black/African American agent, and he expressed his opinion that she could do just as well as a senior agent.

43. Huckaby also pointed out that covering open houses for other agents was a volunteer assignment, at which point Newton raised her voice to Huckaby and insisted that – even if he had a family emergency – as far as she was concerned, Huckaby "needed to stay at the home."

44. Because Huckaby's wife was waiting in the car, and because it was obvious this conversation was going nowhere, Huckaby had to leave this meeting.

45. During the time Huckaby worked in the Southlake office, Huckaby never once heard Ms. Schult or Newton raise their voices at a white realtor for leaving an open house early, or for anything else.

46. On or about March 3, 2020, Huckaby and the other black/African American agent met with Ms. Zareen Khan ("Khan") – Briggs-Freeman's Chief Financial Officer – to discuss the people in the Southlake office who seemed to be non-team-like-minded when it came to them (the black, African Americans).

47. This meeting occurred at the corporate office. During this meeting, Huckaby informed Khan it appeared Huckaby was being singled out and picked on for speaking up for himself and defending the other black/African American agent.

48. Huckaby explained to Khan that Newton now seemed to be watching his every move, scrutinizing his paperwork, and questioning everything he did.

49. Huckaby pointed out that one of Southlake's senior agents – David Fielder – often had agents from other brokerages cover his open houses (which seemed inconsistent with Newton's insistence that they always had to be covered by Briggs-Freeman agents and were mandatory), but Ms. Khan didn't seem interested.

50. Instead of addressing Huckaby's concerns that the Southlake office's two black/African American realtors were being treated differently than the white agents, Khan instead shifted the topic of the meeting, now bringing up a listing contract in which Huckaby was paying a 1% commission to a buyer's agent. Huckaby informed Khan he had received permission from the previous Southlake manager (Schult), but Khan indicated next time this would not be allowed, and that if the listing expired, Huckaby would be required to tell the client the client would be required to pay 3% to the buyer's agent if the listing agreement renewed.

51. After Huckaby's March 3, 2020, meeting with Khan to report the disparate treatment of the Southlake office's only two black/African American realtors, Newton continued to hound Huckaby on numerous occasions about paperwork and contracts supposedly not having been signed.

52. In response, Huckaby would often send Newton a picture of the paperwork, to which Newton would respond she had "found it." Newton also separated the two black/African American agents, and kept them from working together, by removing other black/African American agent

from Huckaby's team and informing her Huckaby would no longer be mentoring her – that a white agent would now instead be mentoring her.

53. Over the next couple of months (April and May of 2020), Huckaby tried to keep a low profile, but Newton's hostile treatment of him (following his pointing out the racial inequities in how he and the other black/African American agent had been treated) continued.

54. Huckaby was aware that another agent (who was white) had previously been allowed to transfer from Briggs-Freeman's Southlake office to its Plano office on request.

55. After enduring several weeks of hostile treatment by Newton following his report of racially disparate treatment, and seeing no attempt by Khan to rectify the situation, on or about May 23-25, 2020, Huckaby sought treatment equal to the treatment the transferring white agent had received, by sending an E-mail to Khan letting her know he would like to transfer out of the Southlake office to another office.

56. When Khan asked why, Huckaby responded that he was still not getting the support he needed from his Southlake manager (Newton), whose racially disparate treatment and hostile work environment Khan and Huckaby had previously discussed.

57. Late on May 26, 2020, over a Zoom meeting (by this time the company was in COVID-19 mode), Huckaby reminded Khan, and now informed Briggs-Freeman's Chief Operating Officer Russ Thompson (also white) of the disparate treatment and hostile work environment he and the other black/African American realtor in the Southlake office had experienced, and that Huckaby was continuing to experience with Newton.

58. Huckaby pointed out to Khan and Thompson that this did not appear to be happening to any of the white agents. Huckaby told them he was fine with Newton looking at his work (after

all, she was his immediate supervisor and the manager of the Southlake office), but he was not OK with how she talked to him or treated him.

59. Khan, of course, knew from their March conversation that this treatment by Newton (Huckaby's white manager) had begun after the open house incident in which the white listing agent had insulted the black, African American agent ("she's not that smart"), and Huckaby had stood up for her to both the white listing agent and Newton.

60. Khan and Thompson informed Huckaby he might not be allowed to move unless he first sat down and tried to work things out with Newton.

61. Huckaby responded by asking why *he* was being made to sit down and "work things out" with the Southlake manager, when a white agent had been allowed to transfer to the Plano office on request, without first having to sit down with her Southlake manager and work things out?

62. Thompson asked Huckaby if he would consider a transfer to Fort Worth and whether Huckaby had met the manager there. Huckaby indicated he had met her, she was fine, and Huckaby thought he could be happy there. Thompson and Khan informed Huckaby they had written everything down in their notes, and they would call Newton and get back with him.

63. On May 29, 2020, Khan and Thompson called Huckaby at 4:30 p.m. and informed him they had spoken with both the office manager in Fort Worth and Newton in Southlake. They told Huckaby he was "not a good fit" for their company.

64. Huckaby asked why Newton had broken up the "black team" and moved the black/African American agent to be mentored by a white realtor who was not properly mentoring her.

65. Thompson responded that "after all that we've heard" Huckaby was not a good fit for the company, and they were letting him go.

66. Plaintiff will show he was discriminated against because of race, national origin and color, because he experienced a hostile work environment, both fostered and tolerated by an owner of the company, Ronnie Briggs.

67. Once he reported it in February of 2020, the hostile work environment and disparate treatment only got worse.

68. When Huckaby attempted to transfer to the Plano office, his transfer was denied. When Huckaby asked why a white agent had been allowed to transfer to the Plano office without having to "work things out" with her manager, but he wasn't, Huckaby was fired within three (3) days.

69. Plaintiff will show the denial of Huckaby's transfer request and his termination were discrimination in the form of disparate treatment, because of race, national origin and color.

70. Alternatively, both the denied transfer and termination were retaliation against Huckaby, for having reported disparate treatment and a hostile work environment because of race, national origin and color.

## V.     ADMINISTRATIVE PROCEDURES FOR TITLE VII, TEXAS LABOR CODE CHAPTER 21

71. Huckaby timely submitted a questionnaire/complaint to the Texas Workforce Commission and the Equal Employment Opportunity Commission ("EEOC") on or about November 12, 2020, well within one hundred eight (180) days of the last day of his hostile work environment at Briggs-Freeman, his denied transfer, and his termination. On his questionnaire/complaint, Huckaby indicated his desire to file a Charge of Discrimination, as well as his desire that his Charge be dual-filed with both agencies. Huckaby further perfected his inquiry by timely signing the Charge of Discrimination when it was presented to him by the Texas Workforce Commission's Civil Rights Division, and this perfection relates back to his original filing date of November 12, 2020.

72.     When Briggs-Freeman failed to resolve this matter at the administrative level, the TWC issued Huckaby a right to sue letter on May 12, 2022. Huckaby timely files this Complaint within sixty (60) days of receiving his right to sue letter.

## VI.     CAUSE OF ACTION

**Hostile Work Environment, Refusal to Transer, and Termination
Because of Race, National Origin and/or Color, in Violation of Title VII,
42 U.S.C. §1981, and Chapter 21 of the Texas Labor Code.**

73.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-72.

74.     Plaintiff alleges that Defendants have discriminated and retaliated against him by treating him differently from and less preferably than similarly situated non-black and non-African American employees or independent contractors and subjecting him to a hostile work environment, discriminatory denial transfer, and termination  discriminatory subjection to disciplinary personnel procedures, disparate terms and conditions of employment or contract, harassment, and other forms of discrimination in violation of Section 1981.

75.     Plaintiff alleges that Defendants retaliated against him for reporting and opposing discrimination because of race, national origin and color.

76.     Defendants' conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiff.

77.     By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Plaintiff, Plaintiff is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

78.     The effect of Defendants' acts complained of above has been to deprive Huckaby of equal employment opportunities as an employee because of his race, national origin and/or color, as

well as depriving him of in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. §1981, and Chapter 21 of the Texas Labor Code.

79. The reasons and/or non-reasons given by Defendant for Huckaby's treatment were a pretext for discrimination and were not the true reason for such treatment.

80. The acts of Defendants complained of herein have been a producing cause of damages to Huckaby, including loss of compensation, wages, salary and commissions, past benefits, future pecuniary losses, mental and emotional distress, humiliation, loss of reputation, loss of enjoyment of life, damage to name and reputation, and other pecuniary and non-pecuniary losses.

81. By reason of the discrimination suffered by Plaintiff, Huckaby is entitled to all legal and equitable remedies available under Title VII, 42 U.S.C. § 2000e, *et seq.,* 42 U.S.C. §1981, and Chapter 21 of the Texas Labor Code, including damages for discrimination, retaliation, and injunctive relief.

## VII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Quintin Huckaby respectfully requests that the Court enter the following relief:

   a. Grant a permanent injunction enjoining Defendants, their officers, successors, assigns and all persons in active concert or participation with Defendants, from engaging in discrimination based on race, national origin and/or color, and/or any other employment practice which discriminates on the basis of race, national origin and/or color;

   b. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees and/or independent contractors, regardless of race, national origin and/or color, and which eradicate the effects of its past unlawful employment practices;

   c. Order Defendants to make Huckaby whole by providing compensation for past and future pecuniary and economic losses resulting from Defendants' unlawful practices described above, including but not limited to back pay, front pay, as well as pecuniary harm, if any, to Huckaby's retirement contributions, vesting, draw schedule, or any other pecuniary loss;

d. Order Defendants to make Huckaby whole by providing compensation for non-pecuniary losses resulting from the unlawful practices described above, including but not limited to mental and emotional distress, humiliation, loss of reputation, loss of enjoyment of life, damage to name and reputation, and other pecuniary and non-pecuniary losses, and nominal damages, in an amount to be determined at trial;

e. Order Defendants to pay Huckaby punitive damages for its malicious and reckless conduct described above, in an amount to be determined at trial;

f. Order Defendants to pay Huckaby's litigation costs and expenses, including reasonable attorneys' fees, reasonable expert witness fees, and court costs, plus pre-judgment and post-judgment interest; and

g. Grant such further relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR JURY

Plaintiff requests trial by jury of all issues of fact raised by his complaint.

Respectfully submitted,

_____
**Walter L. Taylor**
State Bar No. 19727030
***taylorlawfirmdfw@gmail.com***
**TAYLOR LAW FIRM, PLLC**
6630 Colleyville Blvd., Ste. 100
Colleyville, TX  76034
Tel: (817) 770-4343
Fax: (682) 292-7406
**ATTORNEY FOR PLAINTIFF**